UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

VANESSA H. TAYLOR, Personal
Representative of the Estate
of Joseph A. Savage, deceased,

      Plaintiff,

v.                              Civil Action No. 2:19-cv-00770

SETHMAR TRANSPORTATION, INC.;
FREIGHT MOVERS, INC.;
Z BROTHERS LOGISTICS, LLC; and
ALISHER MANSUROV,

      Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

      Pending is defendant Sethmar Transportation, Inc.'s ("Sethmar") motion to dismiss the first amended complaint, filed March 25, 2020.


I. Background


      Plaintiff Vanessa H. Taylor ("Taylor") is a South Carolina resident and is the widow of, and personal representative of the estate of, Joseph A. Savage, deceased ("Savage"). First Am. Compl. ¶ 1, ECF No. 50. Sethmar is an Oregon corporation with its principal place of business in Kansas. <u>Id.</u> ¶ 2. Sethmar operates as a "broker" registered with the Federal Motor Carrier Safety Administration ("FMCSA")

under USDOT No. 2225596.  See id. ¶¶ 2, 11, 66.  The FMCSA

defines a "broker" as

> a person, other than a motor carrier or an employee or
> agent of a motor carrier, that as a principal or agent
> sells, offers for sale, negotiates for, or holds
> itself out by solicitation, advertisement, or
> otherwise as selling, providing, or arranging for,
> transportation by motor carrier for compensation.

49 U.S.C. § 13102(2).[1]  Sethmar advertises that it "offers both

private fleet and common carrier capacity across the Continental

United States."  First Am. Compl. ¶ 2; see also Sethmar Mem.

Supp. 4 (stating that this representation is taken from

"Sethmar's website").

        This action arises out of a November 9, 2017, fatal

accident that occurred on Interstate 77 in Kanawha County

involving Savage and a tractor trailer driven by defendant

Alisher Mansurov ("Mansurov").  See First Am. Compl. ¶¶ 15-17.

---

[1] Taylor occasionally alleges, in very general terms, that
Sethmar operates in FMCSA-regulated capacities other than
broker, such as motor carrier.  See, e.g., First Am. Compl. ¶
11.  However, the first amended complaint specifically alleges
that Sethmar is a broker, First Am. Compl. ¶ 66, and Taylor
seems to confirm that Sethmar is a broker in response to the
motion to dismiss, Taylor Resp. Ex. C, ECF No. 77-3.  Moreover,
Sethmar is also registered with the FMCSA as a broker.  Company
Snapshot of Sethmar Transportation, Inc., USDOT Number: 2225596,
FMCSA, https://safer.fmcsa.dot.gov/query.asp?query_type
=queryCarrierSnapshot&query_param=USDOT&query_string=2225596
(last updated October 11, 2021).  The court therefore proceeds
with the understanding that Sethmar is a "broker" as the FMCSA
defines the term.  See Lopez v. Amazon Logistics, Inc., 458 F.
Supp. 3d 505, 511-12 (N.D. Tex. 2020).

Mansurov, a Pennsylvania resident, was driving northbound[2] at a high rate of speed in a tractor trailer when he lost control, crashed through the concrete median barrier, and completely blocked the southbound roadway.  Id. ¶¶ 6, 15-16.  Savage, who was traveling southbound, crashed into the tractor trailer and perished.  Id. ¶ 17.

At the time of the incident, Mansurov was transporting freight from Halifax, Virginia, to Elkhart, Indiana.  Id. ¶¶ 6, 10, 12.  Sethmar had been hired by Sunshine Mills, Inc., who needed the freight transported from its Halifax, Virginia, facility, to arrange for transportation of the freight.  Id. ¶¶ 2-3, 10.  Sethmar had hired Freight Movers, Inc. ("Freight Movers"), Z Brothers Logistics, LLC ("Z Brothers"), "and/or" Mansurov to transport the freight.  Id. ¶ 11.  The first amended complaint also alleges that Freight Movers, "and/or" Z Brothers, had hired Mansurov to transport the freight.  Id. ¶ 12.  According to the first amended complaint, "the only practical

---

[2] The first amended complaint alleges that Mansurov was driving in the southbound lane.  First Am. Compl. ¶ 15.  Inasmuch as the pleading explains that Mansurov crashed "through" the median barrier before "slid[ing] across both southbound lanes of traffic," id. ¶ 16, and that Savage was traveling in the southbound lanes, id. ¶ 17, the court assumes that Mansurov was traveling northbound before the incident.  A northbound route also comports with Mansurov's scheduled route from Virginia to Indiana.  See id. ¶ 2.

route between [Halifax, Virginia, and Elkhart, Indiana] is through West Virginia." Id. ¶ 2 (emphasis in original).

Mansurov allegedly lacked a valid driver's license to operate a tractor trailer. Id. ¶ 13. Mansurov also allegedly "had at least eight moving violations in the five years prior to the collision and lacked the required knowledge set forth in 49 C.F.R. § 383.111," which includes

> proper procedures for performing basic maneuvers, the effects of speed, the procedures and techniques for controlling the space around the vehicle and basic information on hazard perception and how to make emergency maneuvers, and the ability to "read and speak the English language sufficiently to converse with the general public, [to] understand highway traffic signs and signals[ . . . ], [to] respond to official inquiries, and [to] make entries on reports and records."

Id. ¶ 35 (alterations added and quoting 49 C.F.R. § 391.11). In addition, Freight Movers allegedly

> had a history of safety violations including in the areas of unsafe driving and drivers' hour-of-service, employing drivers with "red flag" violations such as driving with a suspended commercial driver's license, speeding, inattentive driving, failure to obey traffic control device, and phone use, among other things.

Id. ¶ 63. And "Z Brothers' federal motor carrier operating authority had [allegedly] been involuntar[ily] [re]voked over a year prior to the collision." Id. Generally, Taylor claims that "Freight Movers, Z Brothers and Mansurov each lacked the competence and due care required to transport the" freight. Id. ¶ 65.

4

Taylor claims that "Sethmar knew or should have known" of Freight Movers', Z Brothers', and Mansurov's "incompetence and lack of care based on, among other things, industry standards and practices for reasonably careful and prudent freight brokers." Id. ¶ 66. Taylor also claims that Sethmar maintained an employment or agency relationship with Freight Movers, Z Brothers, and Mansurov, and is therefore vicariously liable for their conduct. Id. ¶ 57. Taylor alleges that Sethmar "had the right or power to control the manner of work performed, the right to discharge, [the right to control] the method of payment and/or [the right to control] the level of skill involved, . . . with respect to Defendants Freight Movers, Z Brothers and/or Mansurov and the transportation of this Load." Id. ¶ 58.

On October 23, 2019, Taylor filed her complaint in this court, invoking the court's diversity jurisdiction. Compl. ¶ 7, ECF No. 1. On March 3, 2020, the court granted Taylor leave to file the first amended complaint, ECF No. 49, which Taylor filed that same day, ECF No. 50. She brings seven counts against the defendants: negligence and recklessness against Mansurov (Count I); vicarious liability against Z Brothers for the conduct of Mansurov (Count II); negligence and recklessness against Z Brothers (Count III); vicarious liability against

Freight Movers for the conduct of Z Brothers and Mansurov (Count
IV); negligence and recklessness against Freight Movers (Count
V); vicarious liability against Sethmar for the conduct of
Freight Movers, Z Brothers, and Mansurov (Count VI); and
negligence and recklessness against Sethmar in selecting the
other defendants to transport the freight (Count VII).  First
Am. Compl. ¶¶ 21-69.[3]  Taylor seeks, <u>inter</u> <u>alia</u>, compensatory and
punitive damages.  <u>Id.</u> ad damnum clause.

On December 10, 2019, the West Virginia Secretary of
State accepted service of process for the original complaint on
Sethmar's behalf as its alleged attorney-in-fact under West
Virginia Code § 56-3-33(a).  ECF No. 16.  On March 16, 2020,
Taylor served process for the first amended complaint on a
resident of Bruceton Mills, West Virginia, who was allegedly
designated to accept service on Sethmar's behalf.  ECF No. 56.

On March 25, 2020, Sethmar moved to dismiss the first
amended complaint.  ECF No. 62.  Sethmar argues that (1) the
court lacks personal jurisdiction over Sethmar, (2) Taylor
failed properly to serve Sethmar, (3) Taylor has failed to state
a valid claim against Sethmar, and (4) federal law preempts the

---

[3] Taylor also brought two counts against Sunshine Mills, Inc.,
whom she voluntarily dismissed.  <u>See</u> ECF Nos. 75-76.

negligent selection of a contractor claim against Sethmar.
Sethmar Mem. Supp. 2, ECF No. 63.

To support its motion, Sethmar submitted the
Declaration of Ben Bolan ("Bolan") and a "Contract Carrier
Agreement" between Sethmar and Freight Movers, dated November 8,
2017. <u>See</u> Sethmar Mot. Dismiss Exs. 1-2, ECF Nos. 62-1, -2.
Bolan, Sethmar's president, declares that Sethmar is a broker
that strictly "arranges, or offers to arrange, the
transportation of property by an authorized motor carrier."
Sethmar Mot. Dismiss Ex. 1, Bolan Decl. ¶¶ 2, 4.  Bolan further
declares that Sethmar generally does no business in, and does
not have any contact with, West Virginia.  <u>See</u> <u>id.</u> ¶¶ 7-8, 12-
13.  According to Bolan, Sethmar engaged Freight Movers as an
independent contractor and "never contracted with or employed" Z
Brothers or Mansurov.  <u>Id.</u> ¶¶ 5-6, 9 (citing Sethmar Mot.
Dismiss Ex. 2, Contract Carrier Agreement).  Bolan also avers
that Sethmar "did not propose, suggest, or command a particular
route be taken by the freight carrier in its delivery of the
freight from Virginia to Indiana . . . or know that it would be
routed through West Virginia."  <u>Id.</u> ¶ 14.  Last, Bolan
identifies Sethmar's registered agents for service of process,
none of whom are the West Virginia Secretary of State but one of

whom appears to be the Bruceton Mills resident upon whom Taylor served the first amended complaint.  See id. ¶¶ 10-11.

A "Rate Confirmation Sheet" attached to the Contract Carrier Agreement provides that the carrier is Freight Movers and the driver is an individual named Sergej.  Sethmar Mot. Dismiss Ex. 2, Contract Carrier Agreement.  Pickup is identified in Halifax, Virginia, and delivery is identified in Elkhart, Indiana.  Id.  The scheduled pickup time is listed as 10:00 on November 9, 2017, and the scheduled delivery time is listed as between 07:00 and 16:00 on November 10, 2017.  Id.

In response, Taylor submitted Google Maps directions from Halifax, Virginia, to Elkhart, Indiana.  Taylor Resp. Ex. A, ECF No. 77-1.  The directions list three alternate routes, each of which pass through West Virginia and range from 8 hours and 4 minutes to 9 hours and 17 minutes.  See id.

On March 11, 2020, the court ordered a "stay [of] all proceedings herein except insofar as they relate to motions to dismiss and jurisdictional issues, including evidentiary matters with respect to personal jurisdiction and service of process." ECF No. 49.

## II. Motion to Dismiss Standards

### A. Rule 12(b)(2) -- Lack of personal jurisdiction

Rule 12(b)(2) permits a court to dismiss a complaint for "lack of personal jurisdiction." Fed. R. Civ. P. 12(b)(2). When a district court considers a Rule 12(b)(2) motion without an evidentiary hearing, "the party asserting jurisdiction has the burden of establishing a prima facie case of jurisdiction." Hawkins v. i-TV Digitalis Tavkozlesi zrt., 935 F.3d 211, 226 (4th Cir. 2019). This prima facie analysis resembles the plausibility analysis under Rule 12(b)(6). Id. "[T]he district court must determine whether the facts proffered by the party asserting jurisdiction -- assuming they are true -- make out a case of personal jurisdiction over the party challenging jurisdiction." Id. (citing Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd., 911 F.3d 192, 196-97 (4th Cir. 2018)). Importantly, the "plaintiff must eventually prove the existence of personal jurisdiction by a preponderance of the evidence, either at trial or at a pretrial evidentiary hearing." New Wellington Fin. Corp. v. Flagship Resort Dev. Corp., 416 F.3d 290, 294 n.5 (4th Cir. 2005) (emphasis added) (quoting Prod. Grp. Int'l v. Goldman, 337 F. Supp. 2d 788, 793 n.2 (E.D. Va. 2004) (citation omitted)).

In considering a challenge to personal jurisdiction at the pleadings stage, a district court may consider affidavits and other exhibits submitted by the parties.  Id.; UMG Recordings, Inc. v. Kurbanov, 963 F.3d 344, 350 (4th Cir. 2020). Additionally, the court "must resolve all factual disputes and draw all reasonable inferences in favor of the party asserting jurisdiction." Hawkins, 935 F.3d at 226 (citing Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 560 (4th Cir. 2014)).  Whether a party has established a prima facie case of personal jurisdiction is a question of law.  Id. at 226-27 (citing Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 396 (4th Cir. 2003)).

B. Rule 12(b)(5) -- Insufficient service of process

Rule 12(b)(5) permits a defendant to move to dismiss a complaint for "insufficient service of process."  Fed. R. Civ. P. 12(b)(5).  The "[p]laintiff bears the burden of establishing the validity of service once that service is contested." McCoy v. Norfolk S. Ry. Co., 858 F. Supp. 2d 639, 651 (S.D. W. Va. 2012).  So long as the defendant received actual notice of the suit, a district court should liberally construe the technical requirements of service.  Elkins v. Broome, 213 F.R.D. 273, 275 (M.D.N.C. 2003) (citing Karlsson v. Rabinowitz, 318 F.2d 666,

668-69 (4th Cir. 1963)).  Still, "the rules are there to be
followed, and plain requirements for the means of effecting
service of process may not be ignored."  Armco, Inc. v. Penrod-
Stauffer Bldg. Sys., Inc., 733 F.2d 1087, 1089 (4th Cir. 1984).
Whether service of process was insufficient is within a district
court's discretion.  Brown-Thomas v. Hynie, 367 F. Supp. 3d 452,
461 (D.S.C. 2019).


     C. Rule 12(b)(6) -- Failure to state a claim


          Federal Rule of Civil Procedure 8(a)(2) requires that
a pleading "contain ... a short and plain statement of the claim
showing that the pleader is entitled to relief."
Correspondingly, Rule 12(b)(6) provides that a pleading may be
dismissed for a "failure to state a claim upon which relief can
be granted."  Fed. R. Civ. P. 12(b)(6).

          To survive a motion to dismiss, a pleading must recite
"enough facts to state a claim to relief that is plausible on
its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570
(2007); see also Monroe v. City of Charlottesville, 579 F.3d
380, 386 (4th Cir. 2009) (quoting Giarratano v. Johnson, 521
F.3d 298, 302 (4th Cir. 2008)).  In other words, the "[f]actual
allegations must be enough to raise a right to relief above the
speculative level."  Twombly, 550 U.S. at 555 (citation

omitted); <u>see also</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)

("A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct

alleged."); <u>Andrew v. Clark</u>, 561 F.3d 261, 266 (4th Cir. 2009)

(quoting <u>Twombly</u>, 550 U.S. at 555).

   A district court's evaluation of a motion to dismiss

is underlain by two principles.  First, the court "must accept

as true all of the factual allegations contained in the

[pleading]."  <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (citing

<u>Twombly</u>, 550 U.S. at 555-56).  In doing so, factual allegations

should be distinguished from "mere conclusory statements," which

are not to be regarded as true.  <u>Iqbal</u>, 556 U.S. at 678 ("[T]he

tenet that a court must accept as true all of the allegations

contained in a complaint is inapplicable to legal

conclusions.").  Second, the court must "draw[] all reasonable

factual inferences . . . in the [nonmovant's] favor."  <u>Edwards</u>

<u>v. City of Goldsboro</u>, 178 F.3d 231, 244 (4th Cir. 1999).

III. Discussion

A. Service of process

The court first turns to Sethmar's argument that
service of process was untimely and improper.  Federal Rule of
Civil Procedure 4(h) governs the method of service of process on
corporations.  Rule 4(h) provides that a corporation must be
served in accordance with applicable law in the forum state or
the state where service is made, or by serving "an officer, a
managing or general agent, or any other agent authorized by
appointment or by law to receive service of process."  <u>See</u> Fed.
R. Civ. P. 4(h)(1) (incorporating, in part, Rule 4(e)(1) for
service on individuals).  Sethmar argues two points related to
service of process.

First, Sethmar contends that Taylor's original process
was improper because the complaint stated that "Exhibit A" was
attached, which Sethmar did not originally receive, Sethmar Mem.
Supp. 8, 8 n.4, and because the complaint misidentified
Sethmar's state of corporation, USDOT identifying number, and
process agent, Sethmar Reply 4 n.4, ECF No. 80.[4]  Notably,

---

[4] The court notes that these arguments cut to the process itself,
rather than its service, and are thus properly classified as a
motion under Rule 12(b)(4).  5B Charles Alan Wright & Arthur R.
Miller, <u>Federal Practice and Procedure</u> § 1353 (3d ed. April 2021

Sethmar does not argue that it did not receive actual notice of Taylor's suit or that the alleged deficiencies of process prejudiced it in any way.  <u>See</u> <u>id.</u> at 7-9; Sethmar Reply 4.

Indeed, twenty-one days after the Secretary of State accepted service of process on Sethmar's behalf, Sethmar appeared before the court jointly with Taylor requesting an extension of time for Sethmar to respond to the complaint.  ECF No. 17.  The court also notes that Exhibit A is a document appointing Taylor as the personal representative of Savage's estate, a matter peripheral to the substance of the allegations against Sethmar and that is explicitly not required by the Federal Rules of Civil Procedure.  <u>See</u> Fed. R. Civ. P. 9(a)(1)(B).  In any event, Taylor states that she provided Exhibit A to Sethmar when she learned Sethmar did not have it, a fact Sethmar does not contest.  Taylor Resp. 10 n.57 (citing ECF No. 43).  Last, the first amended complaint also appears to correctly identify Sethmar.  <u>See</u> First Am. Compl. ¶ 2. Therefore, the mere technical faults of Taylor's original process do not make the process improper.  <u>See</u> <u>Palmer v.</u> <u>Roberts</u>, No. 04CV73635, 2005 WL 1631267, at *2 (E.D. Mich. July

---

update) ("An objection under Rule 12(b)(4) concerns the form of the process rather than the manner or method of its service. . . . A Rule 12(b)(5) motion is the proper vehicle for challenging the mode of delivery or the lack of delivery of the summons and complaint." (footnote omitted)).

6, 2005) (denying Rule 12(b)(4) motion where misidentified defendant nonetheless received timely notice of the complaint and plaintiff correctly identified defendant in amended complaint); cf. Delwood Equip. & Fabrication Co. v. Matec in Am., No. 2:16-cv-01843, 2017 WL 190096, at *3 (S.D. W. Va. Jan. 17, 2017) (finding process proper despite failing to attach the contract plaintiff was suing upon).

Second, Sethmar argues that Taylor failed to make timely service on an individual or entity competent to receive service on its behalf.  See Sethmar Mem. Supp. 8-9.  Taylor timely served process for the original complaint upon the West Virginia Secretary of State, ECF No. 16, which is permissible so long as Sethmar falls under one of West Virginia's long-arm statutes, West Virginia Code §§ 31D-15-1501(d), 56-3-33(a), see Taylor Resp. 9-10.  Inasmuch as whether Sethmar falls under a West Virginia long-arm statute is an integral consideration of personal jurisdiction, the court addresses the issue below in the personal jurisdiction analysis.  If the court has personal jurisdiction over Sethmar, then service of process was also proper.  See 5B Wright & Miller, supra, § 1353 ("[S]ome federal courts have treated a Rule 12(b)(5) motion as if it were a Rule 12(b)(2) motion for lack of personal jurisdiction.  This is especially common when the reach of a state long-arm statute or

15

the question whether a defendant corporation is 'doing business' within the forum state is in issue." (footnotes omitted)).

   B. Personal jurisdiction

        "Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." Daimler AG v. Bauman, 571 U.S. 117, 125 (2014) (citing Fed. R. Civ. P. 4(k)(1)(A)).  This decision involves two steps: (1) assessing whether the forum state's long-arm statute authorizes jurisdiction and (2) ensuring that such "application of the long-arm statute is consistent with the due process clause of the Fourteenth Amendment." UMG Recordings, 963 F.3d at 350. The long-arm statutes of many states are coextensive with due process, collapsing the two-prong test into one inquiry.  Id. at 350-51.  But West Virginia's long-arm statutes are not, so the court "must use [the] two-step approach."  Syl. Pt. 3, State ex rel. Ford Motor Co. v. McGraw, 788 S.E.2d 319 (W. Va. 2016).[5]

_____

[5] Sethmar notes that the Fourth Circuit has stated that West Virginia's long-arm statutes are coextensive with due process. Sethmar Mem. Supp. 3 n.1 (quoting In re Celotex Corp., 124 F.3d 619, 627 (4th Cir. 1997), and citing Pittsburgh Terminal Corp. v. Mid Allegheny Corp., 831 F.2d 522, 525 (4th Cir. 1987)). Inasmuch as the Supreme Court of Appeals of West Virginia directs trial courts to conduct the two-step inquiry, West Virginia's long-arm statutes are incongruent with due process and may reach shorter or further than due process allows.

16

1. West Virginia's long-arm statutes

West Virginia has two long-arm statutes, West Virginia
Code §§ 56-3-33(a) and 31D-15-1501(d).  __Id.__  Taylor contends
that Sethmar falls within reach of section 56-3-33(a)(2).
Taylor Resp. 8.  That section confers personal jurisdiction on a
nonresident who "[c]ontract[s] to supply services or things in
this state."  W. Va. Code Ann. § 56-3-33(a)(2) (West 2021,
amended June 4, 2020).[6]  The court also notes that section 31D-
15-1501(d)(1), although not referenced by Taylor, similarly
confers personal jurisdiction over a foreign corporation that

---

[6] Section 56-3-33 reaches nonresident defendants who engage in
the following:

> (1) Transacting any business in this state;
>
> (2) Contracting to supply services or things in this
> state;
>
> (3) Causing tortious injury by an act or omission in
> this state; [or]
>
> (4) Causing tortious injury in this state by an act or
> omission outside this state if he or she regularly
> does or solicits business, or engages in any other
> persistent course of conduct, or derives substantial
> revenue from goods used or consumed or services
> rendered in this state . . . .

W. Va. Code Ann. § 56-3-33(a)(1)-(4) (subsections (5)-(7) are
omitted as irrelevant).

"makes a contract to be performed, in whole or in part, by any party thereto in this state." Id. § 31D-15-1501(d)(1).[7]

Case law interpreting these provisions is sparse. Although the statutory language is plain, the court pauses to note that the language imposes an element of purpose before a defendant falls within the statutes' reach. Thus, it is not enough to make a contract that only incidentally or by happenstance touches upon West Virginia. Rather, there must be some degree of knowledge, foresight, or purpose by the nonresident defendant that some part of the performance of the contract will occur in West Virginia. States with similarly worded long-arm statutes that are incongruent with due process like West Virginia's read a purposeful element into their statutes. E.g. D & R Glob. Selections, S.L. v. Bodega Olegario

---

[7] Section 31D-15-1501(d) applies only to foreign corporations and, borrowing from section 56-3-33(a)(1), provides that a foreign corporation "transact[s] business in this state if":

(1) The corporation makes a contract to be performed, in whole or in part, by any party thereto in this State[ or]

(2) The corporation commits a tort, in whole or in part, in this State . . . .

W. Va. Code Ann. § 31D-15-1501(d)(1)-(2) (subsection (3) is omitted as irrelevant).

Falcon Pineiro, 78 N.E.3d 1172, 1175 (N.Y. 2017); Snyder v.
Hampton Indus., Inc., 521 F. Supp. 130, 145 (D. Md. 1981).

      Mindful of that principle, Taylor alleges that "the
only practical route" between the pickup and delivery points in
this case passes through West Virginia, First Am. Compl. ¶ 2
(emphasis in original), a claim she bolsters with directions
from Google Maps showing the three apparently fastest routes all
passing through West Virginia, Taylor Resp. Ex. A.  Thus, Taylor
argues that Sethmar must have contemplated that the driver would
pass through West Virginia when it brokered the shipment of the
freight and, as a result, made a contract to supply services or
to be performed in this state.  See Taylor Resp. 2-6, 8.

      Taylor likens this case to the District of Maryland's
decision in Vogel v. Morpas, No. RDB-17-2143, 2017 WL 5187766
(D. Md. Nov. 9, 2017).  In Vogel, a nonresident broker
contracted with a carrier to ship freight from Hart, Michigan,
to Philadelphia, Pennsylvania.  Id. at *1.  The contract
required two "intermediate stops" in Maryland along the way.
Id.  While driving in Maryland, the driver struck and killed
Jean Vogel, whose estate filed suit in Maryland.  Id.

      Maryland's long-arm statute covers "[c]ontracts to
supply goods [and] services . . . in" Maryland.  Id. at *4
(quoting Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(2)).  "The

issue," the district court explained, "[was] whether by
brokering the [contract] that directed [the carrier] to make
stops in Maryland, [the nonresident broker] contracted to supply
goods or services in Maryland" in satisfaction of the long-arm
statute.  Id.  Because the brokered contract "facilitated the
stops in Maryland," the district court held that the plaintiff
made a prima facie showing under the long-arm statute.  Id.

Taylor contends that, like Vogel, Sethmar facilitated
Mansurov's path through West Virginia because "the only
practical route" passes through West Virginia even though the
brokered agreement did not require it.  See Taylor Resp. 9
(emphasis in original).  Sethmar disagrees for two reasons.

First, Sethmar argues that it contracted with Freight
Movers, not Z Brothers or Mansurov, and that Freight Movers must
have "re-brokered" the contract without Sethmar's knowledge.
Id. at 2 (citing Sethmar Mot. Dismiss Ex. 1, Bolan Decl. ¶ 5).
As a result, Sethmar contends that Taylor's claims must "arise
out of whatever contract existed between Freight Movers and Z
Brothers, not any contract of Sethmar."  See id. at 2-3.

The district court in Vogel dispensed with a similar
argument.  The broker in that case emphasized the intermediary
role of brokers, where evidently the broker's client sets the
terms of the contract and the carrier supplies the

20

transportation service with the broker acting as an uninterested middleman.  See 2017 WL 5187766, at *4.  Even so, the district court found that, viewing the facts most favorably to the plaintiff, the broker satisfied Maryland's long-arm statute simply because of its role in "agree[ing] to arrange for the transfer of" the freight with two stops in Maryland.  Id.  The court finds Vogel persuasive for the notion that a broker, despite an apparently intermediary role, is nonetheless instrumental to the contract to ship freight.  The fact that Freight Movers may have "re-brokered" the contract does not change Sethmar's instrumental role in its creation.

Second, Sethmar notes that the contract in Vogel required two stops in Maryland, while the Contract Carrier Agreement in this case does not mention West Virginia.  Sethmar Reply 2.  But the Contract Carrier Agreement does require timely shipment of freight from and to two definite points: from Halifax, Virginia, to Elkhart, Indiana.  And viewing the facts most favorably to Taylor, all the fastest routes pass through West Virginia.  Thus, the parties involved surely had the foresight that the contract required traversing the jurisdictions along the most obvious and efficient routes for a timely and economical delivery.  That is, that the contract would "be performed, in whole or in part, by any party thereto

in [West Virginia]."  W. Va. Code Ann. § 31D-15-1501(d)(1); <u>see</u>
<u>also</u> <u>id.</u> § 55-3-33(a)(2).

Accordingly, Taylor has made a prima facie showing
that West Virginia's long-arm statutes are satisfied.

2. Due process

To satisfy due process, "a defendant must have
sufficient 'minimum contacts' with the forum state such that
'the maintenance of the suit does not offend traditional notions
of fair play and substantial justice.'"  <u>Consulting Eng'rs Corp.</u>
<u>v. Geometric Ltd.</u>, 561 F.3d 273, 277 (4th Cir. 2009) (quoting
<u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945)).  Courts
may evaluate minimum contacts through the prism of general or
specific jurisdiction.  <u>See</u> <u>Perdue Foods LLC v. BRF S.A.</u>, 814
F.3d 185, 188-89 (4th Cir. 2016).  Taylor contends that "[o]nly
specific jurisdiction is at issue here."  Taylor Resp. 2.

A court has specific jurisdiction over a nonresident
defendant who "has 'purposefully directed' his activities at
residents of the forum, and the litigation results from alleged
injuries that 'arise out of or relate to' those activities."
<u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 472-73 (1985)
(citations omitted) (quoting <u>Keeton v. Hustler Mag., Inc.</u>, 465

22

U.S. 770, 774 (1984), and Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984)). In other words, the defendant must have "purposefully established 'minimum contacts' in the forum State" "such that he should reasonably anticipate being haled into court there." Id. at 474 (quoting Int'l Shoe, 326 U.S. at 316, and World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)). "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" Id. at 475 (quoting Keeton, 465 U.S. at 774; World-Wide Volkswagen, 444 U.S. at 299; and Helicopteros Nacionales, 466 U.S. at 417). "So long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction." Id. at 475 n.18 (quoting McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957)).

The specific jurisdiction "analysis is not 'mechanical;' a court must weigh 'the totality of the facts before' it." Perdue Foods, 814 F.3d at 189 (quoting Burger King, 471 U.S. at 478, and Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 561 (4th Cir. 2014)). Nevertheless, the Fourth Circuit sets forth three factors to guide the specific jurisdiction analysis:

23

> (1) the extent to which the defendant purposefully
> availed itself of the privilege of conducting
> activities in the State; (2) whether the plaintiffs'
> claims arise out of those activities directed at the
> State; and (3) whether the exercise of personal
> jurisdiction would be constitutionally reasonable.

UMG Recordings, 963 F.3d at 352 (quoting Consulting Eng'rs, 561
F.3d at 278).

   Taylor draws the court's attention to two district
court decisions, Turner v. Syfan Logistics, Inc., No. 5:15cv81,
2016 WL 1559176 (W.D. Va. Apr. 18, 2016), and Brandi v. Belger
Cartage Serv., Inc., 842 F. Supp. 1337 (D. Kan. 1994).  See
Taylor Resp. 2-7.  In those cases, the district courts exercised
specific jurisdiction over nonresident brokers for claims
arising out of incidents in the forum states, which were along
the way between the carrier's pickup and delivery points.
Brokers, according to the courts, regularly arrange interstate
freight shipment from one point to another, so they surely
contemplate that a driver will pass through the intervening
states.  See Turner, 2016 WL 1559176, at *4-7; Brandi, 842 F.
Supp. at 1341-42.  Consequently, the courts concluded that a
broker could reasonably anticipate being haled into court in
those states.  See Turner, 2016 WL 1559176, at *4-7; Brandi, 842
F. Supp. at 1341-42.  At least two other district courts have
confronted similar facts and agreed.  See Dixon v. Stone Truck

Line, Inc., No. 2:19-cv-000945-JCH-GJF, 2020 WL 7079047, at *6-8
(D.N.M. Dec. 3, 2020); Vogel, 2017 WL 5187766, at *6.

        The court finds that line of cases persuasive.  In
this case, "the logical routes . . . all go through [West
Virginia]." Dixon, 2020 WL 7079047, at *7.  Thus, Mansurov
"would have to go out of his way not to travel through [West
Virginia] to transport" the freight.  Id.  And because
"[Sethmar] brokered the contract that it knew [or] should have
been aware[] would result in the shipment travelling through
[West Virginia], [Sethmar] purposefully availed itself of the
benefits and privileges of [West Virginia] for this shipment."
Id. (citing Vogel, Turner, and Brandi).

        In addition, Taylor's claims "arise out of th[e]
activities directed at [West Virginia]," the fatal collision
with Mansurov.  UMG Recordings, 963 F.3d at 352.  And "the
exercise of personal jurisdiction would be constitutionally
reasonable," id., because Sethmar advertises that it brokers
transportation nationwide and West Virginia has an interest in
resolving disputes related to fatal collisions on its roads.
Moreover, the interests of Taylor and judicial economy weigh in
favor of resolving all the claims resulting from the collision
in the same forum.  See generally Asahi Metal Ind. Co. v.
Superior Ct. of Cal., 480 U.S. 102, 113 (1987) (listing factors

to consider when "determin[ing] . . . the reasonableness of the exercise of jurisdiction").

Sethmar counters that any contact with West Virginia was merely "fortuitous" because Sethmar allegedly "had no understanding that the freight would necessarily be routed through West Virginia." Sethmar Mem. Supp. 6. Sethmar also separates itself from the parties involved in the collision, insisting that it contracted with Freight Movers and could not have foreseen Z Brothers or Mansurov driving the freight. Sethmar Reply 3 (citing Bolan Decl. ¶ 9 and the Contract Carrier Agreement).

Sethmar's arguments are unavailing. Given that the quickest routes all pass through West Virginia, it would have been fortuitous had the carrier gone out of its way to transport the freight on a less efficient and more expensive route through another jurisdiction. See Dixon, 2020 WL 7079047, at *7. And whether Freight Movers or another party transported the freight is immaterial because "[Sethmar's] contacts with the forum" are what is relevant to the specific jurisdiction analysis. See Bristol-Myers Squibb Co. v. Superior Ct. of Cal., 137 S. Ct. 1773, 1780 (2017) (emphasis in original) (quoting Daimler AG, 571 U.S. at 127); see also Helicopteros Nacionales, 466 U.S. at 414 ("When a controversy is related to or 'arises out of' a

26

defendant's contacts with the forum, the Court has said that a 'relationship among the defendant, the forum, and the litigation' is the essential foundation of in personam jurisdiction." (quoting Shaffer v. Heitner, 433 U.S. 186, 204 (1977)).  Sethmar targeted West Virginia when it brokered the Contract Carrier Agreement, out of which arose this litigation.

Accordingly, viewing the facts in her favor, Taylor has made a prima face case of personal jurisdiction over Sethmar in this court.  Sethmar's motion to dismiss for lack of personal jurisdiction is denied.

C. Failure to state a claim

Before discussing the merits, the court first addresses Sethmar's request that the court consider the affidavit and contracts attached to its briefs when deciding its motion to dismiss.  See Sethmar Mem. Supp. 11; Sethmar Reply 5-6.  There are two ways that a court can consider documents outside the pleadings on a motion to dismiss.[8]  First, under

---

[8] Rule 12(d) provides that, in all other cases, the consideration of matters outside the pleadings converts a motion to dismiss to a motion for summary judgment. Fed. R. Civ. P. 12(d).  Neither party requests the court to convert the motion to one for summary judgment, and the court declines to do so.  See Logar v. W. Va. Univ. Bd. of Governors, 493 F. App'x 460, 461 (4th Cir. 2012) (stating that whether to consider matters outside the

Federal Rule of Civil Procedure 10(c), "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading."  Second, "the court may consider documents extrinsic to the complaint if they are integral to and explicitly relied on in the complaint and if there is no dispute as to their authenticity."  Tinsley v. OneWest Bank, FSB, 4 F. Supp. 3d 805, 819 (S.D. W. Va. 2014) (quotation marks omitted).

The affidavit and contracts fit neither category. Taylor did not attach them to her complaint, and none is "integral to and explicitly relied on in the complaint."  Id. The court thus declines to consider matters outside the pleadings on Sethmar's motion to dismiss.

### 1. Count VI -- Vicarious liability

Sethmar seeks dismissal of Count VI of the complaint, which alleges that Sethmar is vicariously liable for the conduct of Freight Movers, Z Brothers, and Mansurov.  See First Am. Compl. ¶¶ 56-60.  "Where a defendant has control over the negligent actor, he may be vicariously liable for that actor's negligence."  Thomas v. Raleigh Gen. Hosp., 358 S.E.2d 222, 224

---

pleadings and convert a motion to dismiss to a motion for summary judgment is within a district court's discretion).

(W. Va. 1987).  Four factors guide the inquiry into whether a master-servant, principal-agent, or employer-employee relationship exists to impose vicarious liability: "(1) Selection and engagement of the servant; (2) Payment of compensation; (3) Power of dismissal; and (4) Power of control." Syl. Pt. 7, Cunningham v. Herbert J. Thomas Mem'l Hosp. Ass'n, 737 S.E.2d 270 (W. Va. 2012).  The "determinative" factor is "the power to control."  Id.; see also Syl. Pt. 1, McCoy v. Cohen, 140 S.E.2d 427 (W. Va. 1965).

The party seeking to impose vicarious liability bears the burden of proving a prima facie case of the master-servant relationship.  Zirkle v. Winkler, 585 S.E.2d 19, 22 (W. Va. 2003).  If that party makes such a showing, the burden shifts to the party seeking to defeat liability to show that the relationship was that of an independent contractor.  Id.

Sethmar contends that the complaint contains "no more than legal conclusions or bare recitations of the elements of vicarious liability."  Sethmar Mem. Supp. 10 (citing First Am. Compl. ¶¶ 57-58); see also id. at 11; Sethmar Reply 5.  Sethmar also argues that the "few facts actually pled" show that there is no master-servant relationship because, dubiously, those facts allege that Sethmar "'selected' the other defendants" rather than "hired" them.  Sethmar Mem. Supp. 10.

In response, Taylor wholly relies upon a decision from this district, Gilley v. C.H. Robinson Worldwide, Inc., No. 1:18-cv-00536, 2019 WL 1410902 (S.D. W. Va. Mar. 28, 2019). Taylor Resp. 11.  Gilley involved circumstances like this case: a broker moved to dismiss the vicarious liability claim against it for the alleged negligence of a carrier and driver involved in a fatal collision.  2019 WL 1410902, at *1-3, 5-6.  And the allegations, related to vicarious liability in Gilley, track Taylor's allegations against Sethmar.  Compare id. at *2 with First Am. Compl. ¶¶ 56-60.

Ultimately, the court denied the broker's motion, finding that the complaint, viewed in the plaintiff's favor, stated a plausible claim of vicarious liability because it "detailed that some form of a business relationship between the parties did in fact exist and provided notice to [the broker] of the allegations brought against it." Gilley, 2019 WL 1410902, at *6.  Other courts have denied motions to dismiss vicarious liability claims with similar factual bases.  See Thompson v. Intec Commc'ns, LLC, 2:20-cv-00258, 2020 WL 4496516, at *4 (S.D. W. Va. Aug. 4, 2020); Sayers v. Antero Res. Corp., No. 1:14CV140, 2015 WL 520414, at *7 (N.D. W. Va. Feb. 9, 2015); Jones v. D'Souza, No. 7:06CV00547, 2007 WL 2688332, at *2-3 (W.D. Va. Sept. 11, 2007).

The court finds these cases persuasive.  The first amended complaint, taken as true, sets forth that a business relationship existed between Sethmar and the other, negligent defendants where Sethmar occupied the role of master, principal, or employer.  See Gilley, 2019 WL 1410902, at *6.  Indeed, the first amended complaint alleges that Sethmar selected those defendants for the work; had the power to discharge the other defendants; and had the power to control how the other defendants carried out the work, how the other defendants were paid, and the level of skill needed to carry out the work. Thus, the first amended complaint states enough factual matter to "give [Sethmar] fair notice of what the claim is and the grounds upon which it rests" and that rises above "more than the mere possibility of misconduct."  Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010) (quoting Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)).

Sethmar insists that the first amended complaint falls short of the complaint in Hurley v. Wayne County Board of Education, No. 33:16-cv-9949, 2017 WL 2454325 (S.D. W. Va. June 6, 2017), where Sethmar claims that the court "dismissed a vicarious liability claim with more allegations concerning vicarious liability than . . . here."  Sethmar Mem. Supp. 10.

But in <u>Hurley</u>, the court explained that the facts pled actually created an inference that there was no employer-employee relationship.  <u>See</u> 2017 WL 2454325, at *5-6.  Such is not the case here, and Sethmar's motion to dismiss the vicarious liability claim against it under Rule 12(b)(6) is denied.

        2. Count VII -- Negligent selection of a contractor

        Sethmar moves to dismiss Count VII, which is a claim for negligent hiring or selection of a contractor.  <u>See</u> First Am. Compl. ¶¶ 61-69.  In West Virginia, "a principal . . . may be held liable to a third party for civil damages if the principal is negligent in the selection and retention of a contractor, and if such negligence proximately causes harm to the third party."  <u>Sipple v. Starr</u>, 520 S.E.2d 884, 890 (W. Va. 1999).  The test for negligent selection is as follows:

> An employer is subject to liability for physical harm to third persons caused by his [or her] failure to exercise reasonable care to employ a competent and careful contractor (a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or (b) to perform any duty which the employer owes to third persons.

Syl. Pt. 3, <u>id.</u> (alteration in original) (quoting Restatement (Second) of Torts § 411 (Am. Law Inst. 1965)).

        Sethmar argues that the first amended complaint lacks factual support for the allegation that it "knew or should have

known" about the other defendants' alleged incompetence.
Sethmar Mem. Supp. 11 (quoting First Am. Compl. ¶ 63).  Federal
Rule of Civil Procedure 9, however, provides that "knowledge . .
. may be alleged generally."

The first amended complaint details Freight Movers', Z
Brothers', and Mansurov's alleged incompetence and history of
safety and regulatory violations, that Sethmar knew or should
have known about those problems, and that Sethmar's failure to
exercise reasonable care caused the collision underlying this
case.  That is enough to state a plausible claim for negligent
selection.  See Sipple, 520 S.E.2d at 891 (denying defendant's
motion for summary judgment on negligent selection claim where
contractor killed a person with a gun and defendant knew
contractor had brandished the gun before); Thomson v. McGinnis,
465 S.E.2d 922, 929 (W. Va. 1995) (denying defendant's motion
for summary judgment on negligent selection claim where
plaintiff claimed that defendant knew or should have known that
the contractor was unqualified); cf. id. ("[W]here the exercise
of reasonable diligence would disclose facts demonstrating that
the contractor was clearly incompetent for the particular task
contemplated, a reasonably prudent [principal] should not retain
the contractor.").  Sethmar's motion to dismiss Count VII under
Rule 12(b)(6) is denied.

D. Preemption


        Sethmar's primary argument is that Taylor's negligent
selection claim is preempted.  Congress has the authority to
preempt state law through federal legislation by virtue of the
Supremacy Clause.  Oneok, Inc. v. Learjet, Inc., 575 U.S. 373,
376 (2015) (citing U.S. Const. art. VI, cl. 2).  Whether
Congress has preempted state law is "guided first and foremost
by the maxim that 'the purpose of Congress is the ultimate
touchstone in every pre-emption case.'"  Epps v. JP Morgan Chase
Bank, N.A., 675 F.3d 315, 322 (4th Cir. 2012) (quoting Wyeth v.
Levine, 555 U.S. 555, 564 (2009)).  Nevertheless, preemption is
generally disfavored, and courts should "assum[e] that the
historic police powers of the States [are] not to be superseded
by the Federal Act unless that was the clear and manifest
purpose of Congress."  Altria Grp. v. Good, 555 U.S. 70, 77
(2008) (second alteration in original) (quoting Rice v. Santa Fe
Elevator Corp., 331 U.S. 218, 230 (1947)).  This is particularly
true "when Congress has legislated in a field traditionally
occupied by the States."  Id.

        Sethmar argues that the Federal Aviation
Administration Authorization Act (the "FAAAA"), 49 U.S.C. §
14501(c)(1), expressly preempts Taylor's negligent selection

                                34

claim.  Sethmar Mem. Supp. 11.  The FAAAA provides, in relevant

part:

> (1) General rule. -- Except as provided in paragraphs
> (2) and (3), a State, political subdivision of a
> State, or political authority of 2 or more States may
> not enact or enforce a law, regulation, or other
> provision having the force and effect of law related
> to a price, route, or service of any motor carrier . .
> . , broker, or freight forwarder with respect to the
> transportation of property
>
> (2) Matters not covered. -- Paragraph (1) --
>
> > (A) shall not restrict the safety regulatory
> > authority of a State with respect to motor
> > vehicles . . . .

49 U.S.C. § 14501(c).[9]  Thus, the FAAAA expressly preempts state

law "related to a price, route, or service of any . . . broker .

. . with respect to the transportation of property," except for

---

[9] Congress passed the FAAAA as part of a broader effort to
deregulate interstate commerce and trade via air and motor
vehicles.  See Dan's City Used Cars, Inc. v. Pelkey, 569 U.S.
251, 255-56 (2013).  In drafting the FAAAA's preemption clause,
Congress coopted language from the Airline Deregulation Act, 49
U.S.C. § 41713(b)(1).  See id.  The Airline Deregulation Act
states as follows:

> (1) Except as provided in this subsection, a State,
> political subdivision of a State, or political
> authority of at least 2 States may not enact or
> enforce a law, regulation, or other provision having
> the force and effect of law related to a price, route,
> or service of an air carrier that may provide air
> transportation under this subpart.

49 U.S.C. § 41713(b)(1).

a law within "the safety regulatory authority of a State with respect to motor vehicles."  <u>Id.</u>

To begin, the authorities are split as to whether the FAAAA preempts a claim against a broker for negligent selection. <u>Compare</u> Sethmar Mem. Supp. 13, 13 n.7 (collecting cases) <u>with</u> Taylor Resp. 14 n.72, 17 n.73 (collecting cases).  The Ninth Circuit is the only circuit court that has considered the issue, and it concluded that although a negligent selection claim impermissibly "relate[s] to" broker services, the FAAAA's safety exception saves the claim from preemption.  <u>Miller v. C.H. Robinson Worldwide, Inc.</u>, 976 F.3d 1016, 1021-31 (9th Cir. 2020).  The district courts have reached different conclusions on the issue of preemption, and of those finding no preemption, some have found that a negligent selection claim is not "related to" broker services in the first instance.  <u>Compare</u>, <u>e.g.</u>, <u>Skowron v. C.H. Robinson Co.</u>, 480 F. Supp. 3d 316, 320-22 (D. Mass. 2020) (not preempted under safety exception); <u>Lopez v. Amazon Logistics, Inc.</u>, 458 F. Supp. 3d 505, 514-16 (N.D. Tex. 2020) (not preempted under safety exception); <u>Scott v. Milosevic</u>, 372 F. Supp. 3d 758, 769-70 (N.D. Iowa 2019) (not preempted because not "related to" broker services); <u>and Mendoza v. BSB Transp., Inc.</u>, No. 4:20 CV 270 CDP, 2020 WL 6270743, at *2-4 (E.D. Mo. Oct. 26, 2020) (not preempted under safety

36

exception); <u>with</u> <u>Loyd v. Salazar</u>, 416 F. Supp. 3d 1290, 1295-1300 (W.D. Okla. 2019) (preempted); <u>Creagan v. Wal-Mart Transp., LLC</u>, 354 F. Supp. 3d 808, 812-84 (N.D. Ohio 2018) (same); <u>Finley v. Dyer</u>, No. 3:18-CV-78-DMB-JMV, 2018 WL 5284616, at *2-6 (N.D. Miss. Oct. 24, 2018) (same); <u>and</u> <u>Krauss v. IRIS USA, Inc.</u>, No. 17-778, 2018 WL 2063839, at *3-7 (E.D. Pa. May 3, 2018) (same).

In this circuit, four district courts have considered the issue, including one court in this district, and each decided that the FAAAA does not preempt a claim against a broker for negligent selection. <u>Grant v. Lowe's Home Ctrs., LLC</u>, No. 5:20-02278-MGL, 2021 WL 288372, at *3-4 (D.S.C. Jan. 28, 2021) (not preempted under safety exception); <u>Vitek v. Freightquote.com, Inc.</u>, No. JKB-20-274, 2020 WL 1986427, at *2-4 (D. Md. Apr. 27, 2020) (not preempted because not "related to" broker services); <u>Gilley v. C.H. Robinson Worldwide, Inc.</u>, No. 1:18-cv-00536, 2019 WL 1410902, at *3-5 (S.D. W. Va. Mar. 28, 2019) (not preempted because not "related to" broker services, and under safety exception); <u>Mann v. C.H. Robinson Worldwide, Inc.</u>, No. 7:16-cv-00102, 2017 WL 3191516, at *5-8 (W.D. Va. July 27, 2017) (not preempted because not "related to" broker services, and under safety exception).

Nevertheless, for lack of controlling authority, the court must analyze whether the FAAAA preempts Taylor's claim.

As noted, congressional intent "is the ultimate touchstone in every pre-emption case." Epps, 675 F.3d at 322. "If," as here, "the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993). For reasons explained below, the court finds that Taylor's negligent selection claim is "related to" broker services but is saved from preemption under the safety exception.

       1. Section 14501(c)(1) -- Related to broker services

       The FAAAA expressly preempts state law "related to a price, route, or service of any . . . broker . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). Sethmar contends that Taylor's negligent selection claim is "related to" broker services within the FAAAA's preemptive scope. See Sethmar Mem. Supp. 13-14.

       The Supreme Court explains that the phrase "related to" envelopes state laws "having a connection with or reference to . . . 'rates, routes, or services,' whether directly or indirectly," but not "in only a tenuous, remote, or peripheral . . . manner." Dan's City, 569 U.S. at 260-61 (quotation marks

omitted) (quoting <u>Rowe v. N.H. Motor Transp. Ass'n</u>, 552 U.S. 364, 370-71 (2008)).  In other words, a state law is "related to" a preempted area under the FAAAA "at least where [it] ha[s] a 'significant impact' related to Congress' . . . pre-emption-related objectives" of deregulating the interstate motor carrier industry and increasing competitive market forces.  <u>Rowe</u>, 552 U.S. at 371 (quoting <u>Morales v. Trans World Airlines, Inc.</u>, 504 U.S. 374, 390 (1992)).  Although the Supreme Court has "not sa[id] where, or how, . . . to draw the line" between preempted and non-preempted state law under the FAAAA, Taylor's negligent selection claim does "not present a borderline question" and falls within the FAAAA's preemptive scope.  <u>Id.</u> (quoting <u>Morales</u>, 504 U.S. at 390)).

"The selection of motor carriers is one of the core services of brokers." <u>Miller</u>, 976 F.3d at 1024 (quotation marks omitted).  Indeed, a "broker" is defined as a person who, <u>inter alia</u>, "arrang[es] for[] transportation by motor carrier."  49 U.S.C. § 13102(2); <u>see also</u> 49 C.F.R. § 371.2(a).  Inasmuch as a negligent selection claim seeks to interject at the point where a broker "arranges for" a motor carrier to transport property, it is directly and significantly connected to broker services.  <u>See</u> <u>Miller</u>, 976 F.3d at 1024; <u>Skowron</u>, 480 F. Supp. 3d at 320-21; <u>Loyd</u>, 416 F. Supp. 3d at 1297-98.  Consequently, Taylor's

negligent selection claim against Sethmar falls within the preemptive scope of § 14501(c)(1).

Taylor offers a few arguments to the contrary, none of which is persuasive. Taylor argues that the FAAAA's text shows a congressional intent to preempt only positive state law, not common-law tort liability. See Taylor Resp. 16-17. The Supreme Court, however, holds "that the phrase 'other provision having the force and effect of law' includes common-law claims." Nw., Inc. v. Ginsberg, 572 U.S. 273, 284 (2014) (quoting 49 U.S.C. § 41713(b)(1), the Airline Deregulation Act).

Taylor also insists that common-law tort liability is not related to Congress' purpose of enabling competitive market forces in the interstate motor carrier industry through economic deregulation because tort liability is "generally applicable" to all industries and does not "bind" brokers to prices, routes, or services. See Taylor Resp. 17-23; see also id. at 19-22 (citing Bedoya v. Am. Eagle Express Inc., 914 F.3d 812 (3d Cir. 2019)). But Taylor takes an inaccurately broad view of the elements of her negligent selection claim against Sethmar. To prevail, Taylor must prove that Sethmar failed to exercise the ordinary care of a broker selecting a motor carrier. See Syl. Pt. 3, Sipple, 520 S.E.2d 884 (stating cause of action for negligent selection); First Am. Compl. ¶ 62 ("Sethmar had a duty to . . .

arrange transportation on public highways in a safe and
reasonable manner [and] to . . . retain drivers and carriers
that are competent and safe . . . .”).  Clearly, then, Taylor's
common-law claim is “related to” Sethmar's broker services and,
by extension, Congress' intent to deregulate the interstate
brokering industry.

       Taylor's recourse to the case law is equally
unavailing.  Taylor searches for support in cases arising under
the Airline Deregulation Act, after which Congress modeled the
FAAAA.  Taylor Resp. 18-19.  Although the two statutes contain
similar preemptive language and structure, the two statutes
completely diverge in their substantive content.  For instance,
in Taj Mahal Travel, Inc. v. Delta Airlines, Inc., the Third
Circuit lamented the difficulty in deciding where tort cases
fell under the Airline Deregulation Act's “ambiguous preemption
terminology.”  164 F.3d 186, 194 (3d Cir. 1998).  Specifically,
the Airline Deregulation Act preempts state laws having a
connection with “a price, route, or service of an air carrier
that may provide air transportation.”  49 U.S.C. § 41713(b)(1).
“Price,” “route,” and “service” are undefined, and “air carrier”
and “air transportation” are tautologically defined.  See id. §§
40102(a)(2) (“air carrier” means one “provid[ing] air
transportation”), 40102(a)(5) (“air transportation” means

41

"foreign air transportation, interstate air transportation, or the transportation of mail by aircraft"). Consequently, without clear statutory direction, the courts have used varying approaches to draw the contours of what is preempted under the Airline Deregulation Act. See Air Transp. Ass'n of Am. v. Cuomo, 520 F.3d 218, 223 (2d Cir. 2008) (comparing two approaches of defining what constitutes an air carrier "service"). The FAAAA, by contrast, plainly defines the services of a broker, as set forth above.

Taylor also references a trio of cases from the Ninth Circuit. Taylor Resp. 22. However, after the filing of Taylor's brief, the Ninth Circuit rejected the same argument based on the same three cases and found that negligent selection is "related to" broker services. Miller, 976 F.3d at 1024.

Most importantly, Taylor's arguments would require the court to ignore the FAAAA's plain text, "which necessarily contains the best evidence of Congress' pre-emptive intent." Easterwood, 507 U.S. at 664. Accordingly, Taylor's negligent selection claim is deemed related to broker services.

2. Section 14501(c)(2)(A) -- Safety exception


The FAAAA excepts from its preemptive scope, <u>inter</u> <u>alia</u>, state laws within "the safety regulatory authority of a State with respect to motor vehicles."  49 U.S.C. § 14501(c)(2)(A).  Sethmar argues that the phrase "with respect to motor vehicles" narrows the safety exception to the direct regulation of motor vehicles, and that negligent selection only indirectly regulates motor vehicles.  Sethmar Mem. Supp. 14-15.[10] Taylor agrees that negligent selection is an indirect regulation of motor vehicles.  <u>See</u> Taylor Resp. 23-25.  However, Taylor responds that "with respect to motor vehicles" is broad enough to encompass such indirect regulation.  <u>Id.</u>  The court agrees.

"With respect to" is generally synonymous with "relating to" or "related to."  <u>Accord</u> <u>Cal. Tow Truck Ass'n v.</u> <u>City & County of San Francisco</u>, 807 F.3d 1008, 1021 (9th Cir. 2015); <u>cf.</u> <u>City & County of Denver v. Dist. Ct.</u>, 939 P.2d 1353,

---

[10] Sethmar does not argue that negligent selection is not within state safety regulatory authority.  To that point, "[h]istorically, common law liability has formed the bedrock of state regulation, and common law tort claims have been described as 'a critical component of the States' traditional ability to protect the health and safety of their citizens.'"  <u>Desiano v.</u> <u>Warner-Lambert & Co.</u>, 467 F.3d 85, 86 (2d Cir. 2006) (quoting <u>Cipollone v. Liggett Grp., Inc.</u>, 505 U.S. 504, 544 (1992) (Blackmun, J., concurring in part and dissenting in part)).

1366 (Colo. 1997) (en banc).[11]  As noted above, "related to" has a broad scope and means "having a connection with or reference to."  Dan's City, 569 U.S. at 260.

Thus, the phrase "with respect to" saves from preemption state safety regulation having a connection with or reference to motor vehicles, "whether directly or indirectly."  Id.  Negligent selection claims, while directly affecting brokers, indirectly affect motor vehicles by incentivizing the selection of safe and competent motor carriers to drive on the state's roads.  Syl. Pt. 3, Sipple, 520 S.E.2d 884; see also Miller, 976 F.3d at 1030; Grant, 2021 WL 288372, at *4; Skowron, 480 F. Supp. 3d at 321-22) ("Negligent hiring claims . . . applied against transportation brokers . . . help to protect citizens from injuries caused by motor vehicles.  The imposition of liability ensures that a transportation broker exercises reasonable care in hiring an agent to operate a motor vehicle,

---

[11] See also With respect to, Oxford University Press, https://www.lexico.com/en/definition/with_respect_to?locale=en (last visited October 12, 2021) ("as regards; with reference to"); In respect of (with respect to), Cambridge University Press, https://dictionary.cambridge.org/us/dictionary/english/in-respect-of-sth?q=with+respect+to (last visited October 12, 2021) ("in connection with something"); Regarding, Merriam-Webster, https://www.merriam-webster.com/dictionary/regarding (last visited October 12, 2021) ("with respect to; concerning"); Concerning, Merriam-Webster, https://www.merriam-webster.com/dictionary/concerning (last visited October 12, 2021) ("relating to; regarding").

i.e., that it does not arrange for a dangerous motor carrier to operate on highways."); <u>Lopez</u>, 458 F. Supp. 3d at 516.

Even so, Sethmar urges the court to follow the reasoning of the Western District of Oklahoma in <u>Loyd</u>. Sethmar Reply 8.[12]  In <u>Loyd</u>, the district court emphasized that the safety exception references "motor vehicles," not "motor carriers."  <u>See</u> 416 F. Supp. 3d at 1299-1300.  The district court also supposed that "with respect to" is a "limit[ing]" phrase that "narrows the scope of the [safety] exception."  <u>Id.</u> at 1299.  Because negligent selection "only indirectly concerns the safety of . . . motor vehicles," the district court concluded that negligent selection falls outside limited the scope of the safety exception.  <u>Id.</u> at 1299.  Further, the district court cautioned that a "broad[er] reading" -- presumably, one that encompasses indirect regulation -- "would .

---

[12] Sethmar also argues that the FAAAA mandates motor carriers, not brokers, to carry liability insurance, and that this mandate "evinc[es] Congressional intent that brokers not be liable for this conduct."  Sethmar Reply 8-9 (citing <u>Creagan</u>, 354 F. Supp. 3d at 814).  Sethmar's argument has some facial appeal but appears to have its genesis in cases arising under the Airline Deregulation Act, which, as noted, is ambiguous.  <u>See</u> <u>Scott</u>, 372 F. Supp. 3d at 770 (quoting and citing Airline Deregulation Act cases).  Sethmar's policy-based argument is not enough to overcome the clear statutory direction in this case.  <u>Cf.</u> <u>Skowron</u>, 480 F. Supp. 3d at 322 n.5 (dismissing a similar insurance-based argument); <u>Vitek</u>, 2020 WL 1986427, at *4 n.2 (same).

. . swallow the rule of preemption related to brokers'
services," although it did not explain how or why.  <u>Id.</u>

      To the contrary, "with respect to" is not a limiting
phrase, nor is it narrow.  It is understood in the case law and
in common speech to be synonymous with various far-reaching
terms and phrases, including "related to."  And the Supreme
Court has explained that the breadth of "related to" "is
apparent from [its] language; that it has a broad scope and an
expansive sweep; and that it is broadly worded, deliberately
expansive, and conspicuous for its breadth." <u>Morales</u>, 504 U.S.
at 384 (quotation marks and citations omitted) (second
alteration in original) (citing cases).  "With respect to"
therefore encompasses "indirect[]" safety regulation of motor
vehicles, <u>see</u> <u>Dan's City</u>, 569 U.S. at 260, like a negligent
selection claim that incentivizes brokers to select safe and
competent motor carriers to drive motor vehicles in the state.
Accordingly, Taylor's negligent selection claim against Sethmar
falls within the safety exception of § 14501(c)(2)(A) and is not
preempted.  Sethmar's motion to dismiss Count VII under the
FAAAA is denied.

IV. Conclusion

For the foregoing reasons, the court ORDERS that Sethmar's motion to dismiss be, and hereby is, denied.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: October 12, 2021

John T. Copenhaver, Jr.
Senior United States District Judge